UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

RUSSELL BRYANT,

        Plaintiff,

     -v-                                 1:18-CV-562

GENERAL CASUALTY COMPANY
OF WISCONSIN,

        Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                            OF COUNSEL:

MERLIN LAW GROUP                EDWARD ESHOO, JR., ESQ.
Attorneys for Plaintiff             CHRISTINA PHILLIPS, ESQ.
181 West Madison, Suite 3475
Chicago, IL 60602

MERLIN LAW GROUP, P.A.         PAUL LASALLE, ESQ.
Attorneys for Plaintiff
125 Half Mile Road, Suite 201
Red Bank, NJ 07701

FULLERTON BECK                 VERNE PEDRO, ESQ.
Attorneys for Plaintiff
311 Newman Springs Road
Building 1, Suite 143
Red Bank, NJ 07701

GOLDBERG SEGALLA LLP        JONATHAN SCHAPP, ESQ.
Attorneys for Defendant        ADAM ROSS DURST, ESQ.
P.O. Box 657
Buffalo, NY 14201

DAVID N. HURD
United States District Judge

## MEMORANDUM–DECISION and ORDER

## I. INTRODUCTION

On May 9, 2018, plaintiff Russell Bryant ("Bryant" or "plaintiff") filed this breach of contract action after his commercial property insurer, defendant General Casualty Company of Wisconsin ("GCCW" or "defendant"), denied his insurance claim for the alleged partial collapse of a building he owned in Kingston, New York.

On July 10, 2018, Bryant amended his pleading as of right.  Shortly thereafter, GCCW moved under Federal Rule of Civil Procedure ("Rule") 12(b)(6) seeking partial dismissal of plaintiff's operative complaint to the extent it sought recovery of any extra-contractual damages.

On January 30, 2019, the Court granted GCCW's motion for partial dismissal.  *Bryant v. Gen. Cas. Co.*, 2019 WL 367292 (N.D.N.Y. Jan. 30, 2019).  Thereafter, the parties conducted discovery and attempted to mediate what remained of the dispute.  Their inability to reach a negotiated result arose, at least in part, from Bryant's decision to demolish the commercial building before defendant could inspect it for purposes of this litigation.

On March 13, 2020, the parties cross-moved under Rule 56 for summary judgment.  Bryant, for his part, moved for partial judgment on the question of whether the insurance policy covered the damage at issue.  GCCW, for its part, moved for a judgment dismissing the complaint in its entirety.  The motions have been fully briefed and will be considered on the basis of the submissions without oral argument.

## II. **BACKGROUND**

The following facts are undisputed unless otherwise noted.  GCCW issued to Bryant[1] a commercial property and casualty insurance policy that covered, *inter alia*, property damage to a one-story building at 634 Ulster Avenue in Kingston, New York.  Def.'s Rule 7.1(a)(3) Statement ("Def.'s Facts"), Dkt. No. 47-1 ¶¶ 1-2; Pl.'s Rule 7.1(a)(3) Statement ("Pl.'s Facts"), Dkt. No. 46-2 ¶¶ 2, 7; *see also* Ex. D to Schapp Decl., Dkt. No. 47-7 (the "Policy").  The Policy's effective period ran between August 18, 2016 and August 18, 2017.  Def.'s Facts ¶ 1.

Since 2013, Bryant had leased the building to a tenant, which operated a restaurant in the commercial space.  Bryant Dep., Dkt. No. 46-4 at 14:3-9.  In January of 2017, the tenant advised plaintiff that the ceramic tile of the kitchen floor "seemed to be lowering."  Def.'s Facts ¶ 3; Pl.'s Facts ¶ 9.  Plaintiff, who had not been inside the building for several years at that point, had not received any prior complaints from the tenant about the kitchen floor.  Pl.'s Facts ¶¶ 5-6, 10.

Bryant did not take any action in response to this initial complaint.  Bryant Dep. at 17:1-8.  Eventually, though, plaintiff had a construction firm inspect the building and investigate the issue with the kitchen floor.  Pl.'s Facts ¶ 11.  The firm "performed selective demolition of the floor assembly, which revealed a decayed and rotted floor framing system."  *Id*. ¶ 12.[2]  After the firm installed some temporary wood posts under a load-bearing wall in the kitchen, plaintiff advised his tenant that, "due to the extensive damage, it would

---

[1]  The property is technically owned by a trust, but that distinction proves irrelevant to the dispute.

[2]  Plaintiff contends that this decay was present "throughout the Building," but defendant denies this characterization.

not be allowed to reopen the restaurant."  *Id*. ¶¶ 13-14.

In March of 2017, Bryant tendered a claim for the property damage to GCCW.  Def.'s Facts ¶ 4.  Defendant opened a claim file and recorded the loss as "wet rot damage" caused by a "water leak."  Ex. M to Schapp Decl., Dkt. No. 47-16.  Plaintiff denies that he reported the claim as a water leak.  *See* Def.'s Facts ¶ 4.  Notably, though, the construction firm plaintiff hired to investigate the damage had advised by e-mail that the building had been remodeled right over the top of "a decaying existing floor system" with "four to six inches of standing water below the old floor."  Bryant Dep. at 41:2-42:9.

In any event, GCCW hired Kevin Golebiewski, an independent adjuster, to inspect the premises and investigate the cause of the damage.  Def.'s Facts ¶ 5; Pl.'s Facts ¶¶ 16-17.  In a report prepared in April of 2017, Mr. Golebiewski concluded that:

> A leak in the kitchen sink for a long period of time has caused extensive rot damage to the sub-floor and floor joists in this risk. The rotting of the floor boards has also caused some structural issues as support beams are now sitting on nothing as the floor support has completely rotten through.  this has caused some large drywall cracks along several walls in this area.

Ex. I to Schapp Decl., Dkt. No. 47-12.

On May 12, 2017, GCCW denied Bryant's claim for insurance coverage for the loss.  Pl.'s Facts ¶ 23; Def.'s Facts ¶ 8.  In its denial letter, defendant relied on Mr. Golebiewski's finding that water had repeatedly seeped or leaked from the kitchen sink into the subfloor over "the last several months."  Ex. E to Schapp Decl., Dkt. No. 47-8.  Because this kind of damage fit into a policy exclusion for the repeated seepage or leakage of water over a period longer than fourteen days, defendant denied coverage.  *Id*.

On November 22, 2017, Bryant's own adjuster, Joe Charrier, wrote to GCCW with a

request to re-open plaintiff's insurance claim.  Pl.'s Add'l Facts, Dkt. No. 51-3 ¶ 9.  In Mr. Charrier's view, plaintiff had reported the loss incorrectly. *Id*.  According to Mr. Charrier, the claim should be considered as a "collapse" covered under the Policy. *Id*.  Mr. Charrier's letter suggested that defendant should hire its own structural engineer to evaluate the true extent of the damage to the structure. *Id*.

On December 15, 2017, GCCW responded in writing to Mr. Charrier.  Pl.'s Add'l Facts ¶ 12.  According to defendant, it had reviewed the "collapse" coverage provision under the Policy but determined it was inapplicable because "the cause of loss was . . . continuous or repeated leakage of water over a period of 14 days or more, which is an excluded cause of loss." *Id*.  Mr. Charrier requested from defendant a copy of the engineering report upon which it had based this coverage determination, but defendant explained that it had not retained an engineer but had relied instead on Mr. Golebiewski's findings. *Id*. ¶¶ 13-14.

In January of 2018, Bryant hired Jamison Morse, a consulting engineer, to examine the damage to the building.  Pl.'s Facts ¶ 27; Def.'s Facts ¶ 10.  According to plaintiff, Mr. Morse prepared two reports in which he observed "that there was a sudden collapse of the floor framing system in the kitchen area . . . due to its rotted and decayed condition, a condition which was concealed from view by the ceramic tile floor above it."  Pl.'s Facts ¶ 28.  Defendant contests virtually all of Mr. Morse's assertions. *See* Def.'s Facts ¶¶ 28-29, 31-36.

GCCW never re-opened the claim or conducted any additional inspections of its own.  Pl.'s Add'l Facts ¶¶ 16.  So Bryant filed this suit for breach of contract.

## III.  <u>LEGAL STANDARD</u>

The entry of summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show

that there is no genuine issue as to any material fact and that the moving party is entitled to judgment is a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing FED. R. CIV. P. 56(c)).  A fact is "material" for purposes of this inquiry if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  And a "genuine" dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*.

"When deciding a summary judgment motion, a court must resolve any ambiguities and draw all inferences from the facts in a light most favorable to the nonmoving party." *Ward v. Stewart*, 286 F. Supp. 3d 321, 327 (N.D.N.Y. 2017) (citation omitted).  Accordingly, summary judgment is inappropriate where a "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor." *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002) (citation omitted).

"Where, as here, the parties have cross-moved for summary judgment, a reviewing court 'must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.'" *Ward*, 286 F. Supp. 3d at 327 (quoting *Marcano v. City of Schenectady*, 38 F. Supp. 3d 238, 246 (N.D.N.Y. 2014) (McAvoy, J.)).  "In undertaking this analysis, it bears nothing that 'a district court is not required to grant judgment as matter of law for one side or the other.'" *Id*.

## IV. **DISCUSSION**

Bryant has moved for partial judgment on the issue of whether the Policy covers the damage to his building, which he characterizes as a "partial collapse." Pl.'s Mem., Dkt. No.

46-1 at 3.[3]  In plaintiff's view, the property "sustained direct physical damage caused by a collapse of part of it due to hidden decay unknown [to plaintiff]."  *Id.* at 4.  According to plaintiff, courts routinely conclude that a covered "collapse" occurred where, as here, some part of the structure shifts or drops.  *Id.* at 6.

GCCW, on the other hand, has moved for a judgment disposing of the whole case.  According to defendant, Bryant should be sanctioned for spoliating critical evidence during the pendency of this litigation.  Def.'s Mem., Dkt. No. 47-2 at 15.  As defendant explains, plaintiff had the whole building completely demolished despite knowing that defendant had requested an opportunity to inspect the damage to the premises.  *Id.* at 16.  Alternatively, if dismissal is not the appropriate sanction, defendant argues that the Policy does not cover the loss, either because it does not qualify as a "collapse" or because exclusions for water and rot apply.  *Id.* at 17.

### A.  Spoliation

"Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation."  *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999).  "It has long been the rule that spoliators should not benefit from their wrongdoing, as illustrated by that favourite maxim of the law, *omnia presumuntur contra spoliatorem*."  *Id.* (citation and internal quotation marks omitted).

Under Rule 37, a district court may impose sanctions on a party who spoliates evidence in violation of a court order.  FED. R. CIV. P. 37(b).  However, "[e]ven in the absence

---

[3]  Pagination corresponds to CM/ECF.

of a discovery order, a court may impose sanctions on a party for misconduct in discovery under its inherent power to manage its own affairs." *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 106-07 (2d Cir. 2002).  "If a party has an obligation to preserve evidence, the degree of the party's culpability and the amount of prejudice caused by its actions will determine the severity of the sanctions to be imposed." *Aktas v. JMC Dev. Co., Inc.*, 877 F. Supp. 2d 1, 12 (N.D.N.Y. 2012) (D'Agostino, J.).

"To secure spoliation sanctions based on the destruction or delayed production of evidence, a moving party must prove that:  (1) the party having control over the evidence had an obligation to preserve or timely produce it; (2) the party that destroyed or failed to produce the evidence in a timely manner had a 'culpable state of mind'; and (3) the missing evidence is 'relevant' to the moving party's claim or defense, 'such that a reasonable trier of fact could find that it would support that claim or defense." *Aktas*, 877 F. Supp. 2d at 12 (quoting *Residential Funding Corp.*, 306 F.3d at 107).

Unfortunately, this test has been met by Bryant's conduct in this case.  A party has a duty to preserve evidence when it has "notice that the evidence is relevant to litigation, or should have known that the evidence might be relevant to future litigation." *Klezmer ex rel. Desyatnik v. Buynak*, 227 F.R.D. 43, 48 (E.D.N.Y. 2005).

Bryant was on notice that the building was critical evidence.  After litigation in this case got underway, GCCW advised at an initial Rule 16 conference on March 14 before the assigned magistrate judge that it intended to inspect the property prior to scheduling a mediation session.  Schapp Decl., Dkt. No. 47-3 ¶ 5.  Plaintiff contends that he cannot be sure about this assertion, since the attorney who represented him at the conference is no longer employed with the firm.  Pl.'s Response to Def.'s Facts, Dkt. No. 51-2 ¶ 12.

But he does not deny it.  In fact, Bryant concedes that GCCW had advised opposing counsel and the Court "that it may want to inspect the building."  Pl.'s Response ¶ 12. Plaintiff also concedes that his former counsel did not raise any objection to defendant's request for an inspection during this conference.  *Id*. ¶ 13.  And while it is not clear exactly when plaintiff put his own counsel on notice of his demolition plan, he admits that any such plan was not disclosed during the initial conference with the Court.  *Id*. ¶ 15.

Of course, "the obligation to preserve evidence does not continue indefinitely."  *Aktas*, 877 F. Supp. 2d at 13.  For instance, "[t]he duty to preserve evidence may be extinguished by providing the opposing party with an adequate and meaningful opportunity to inspect."  *Id*. (collecting cases).  Alternatively, "[w]hen a party fails to request an inspection of the evidence after being notified of its existence, spoliation sanctions are not appropriate."  *Id*.

However, Bryant unquestionably deprived GCCW of an adequate and meaningful opportunity to inspect the building.  And by his own account of what happened, plaintiff's behavior was intentional and purposeful.[4]  In fact, plaintiff's behavior is remarkable.  The very next day after the Rule 16 conference at which defendant advised of its intention to inspect the building, plaintiff's counsel informed defendant that the building would be demolished "within the next couple of days."  Pl.'s Response ¶ 17; Schapp Decl. ¶ 6.

GCCW objected in writing, warning Bryant's counsel that "failing to afford [ ] a reasonable opportunity to perform the inspection would be deemed a spoliation of material

---

[4]  Where, as here, a party destroys evidence "in bad faith or in a grossly negligent manner," the third factor; i.e., the relevance of the destroyed evidence, may be presumed.  *See, e.g.*, *Dorchester Fin. Holdings Corp. v. Banco BRJ S.A.*, 304 F.R.D. 178, 182 (S.D.N.Y. 2014).

evidence."  Schapp Decl. ¶ 6; *see also* Ex. C to Schapp Decl., Dkt. No. 47-6 (e-mails between counsel concerning demolition plans).  Defendant made additional requests on March 25, April 5, twice on April 12, and on May 8 in an effort to secure an inspection of the property.  Pl.'s Response ¶¶ 18-20.  Importantly, plaintiff never responded with an offer of a time or date for when the requested inspection could take place.

Instead, on May 14 GCCW learned that the building had already been demolished.  Pl.'s Response ¶ 21; Schapp Decl. ¶ 6.  According to Bryant, he demolished the structure "due to financial concerns, as well as his inability to maintain insurance on the property in its collapsed condition."  Pl.'s Response ¶ 23; *see also* Ex. C to Schapp Decl.  Notably, however, plaintiff concedes the building stood up just fine in its damaged condition right up until the moment the demolition crew took over.  Pl.'s Response ¶ 22.  As plaintiff's counsel's May 14 e-mail explained:

> This will confirm the building was demolished.  After my discussion with you via e-mail in March we contacted the client to find out the status of the building.  He advised that given the passage of time, he had to do something with the building and had already made arrangements to demolish.  The contractors were literally staged to begin work at that time and despite our best efforts, we could not prevent the demolition from going forward.

Ex. C to Schapp Decl.

In fact, even now it remains entirely unclear as to precisely when the demolition happened.  Bryant has not offered any affirmative representation, in the form of an affidavit or otherwise, about that issue.  Nor has he attempted to rebut the what his attorney's e-mail and other facts in the record make clear:  that he himself was on notice that GCCW wanted to inspect the building for litigation purposes.

Instead, Bryant's response to this damning recitation of events is that GCCW cannot show prejudice.  According to plaintiff, defendant already had an opportunity to inspect the building during the pre-litigation claim process.  Pl's Response ¶ 20.  In plaintiff's view, defendant should have retained an engineer during its own claim investigation if it wanted to take a more involved look at the property.  Pl.'s Opp'n at 6.

"Destruction of evidence occurs[ ] along a continuum of fault ranging from innocence through the degree of negligence to intentionality.  The resulting penalties vary accordingly."  *Aktas*, 877 F. Supp. 2d at 16 (citation and internal quotation marks omitted).  Particularly outrageous misconduct can even give rise to outright dismissal of a lawsuit.  *West*, 167 F.3d at 779.  However, because dismissal is a "drastic remedy," it "should be imposed only in extreme circumstances, usually after consideration of alternative, less drastic sanctions."  *Id*. (quoting *John B. Hull, Inc. v. Waterbury Petroleum Prods., Inc.*, 845 F.2d 1172, 1176 (2d Cir. 1988)).

"Although a district court has broad discretion in crafting a proper sanction for spoliation, . . . the applicable sanction should be molded to serve the prophylactic, punitive, and remedial rationales underlying the spoliation doctrine."  *West*, 167 F.3d at 779.  "The sanction should be designed to:  (1) deter parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restore the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party."  *Id*. (citation and internal quotation marks omitted).

After considering alternative, less drastic measures—such as an adverse inference instruction at trial—dismissal is the appropriate sanction in this case.  Bryant has no excuse

for the misconduct that occurred.  And his suggestion that GCCW 's adjuster already had an opportunity to inspect the property before litigation commenced is not acceptable.  A plaintiff does not get to decide for a defendant whether a closer or more careful look at some critical piece of evidence—perhaps with the aid of an expert retained for that purpose—might be beneficial to its defense after litigation is filed.  That is especially so in a case like this one, where the litigation between the parties concerned the underlying cause of the damage to the building itself.  In other words, the building's condition was critical evidence.

A couple additional factors support this conclusion.  First and foremost, it is undisputed that Bryant made no attempt to work things out through the judicial process.  If, for instance, plaintiff had some justifiable reason (*e.g.*, a safety concern) to object to GCCW's request for an inspection of the premises, either at the Rule 16 conference or at any point in time afterward, it takes little effort to ask the Court to intercede.[5]

Second, by the time the litigation commenced Bryant had already gone a step beyond simply hiring an adjuster, having also hired his own engineer to inspect the structure and prepare written findings.  Pl.'s Response ¶ 16.  Plaintiff did not disclose this fact to defendant.  Although plaintiff may be correct to assert that he was under no obligation to advise defendant that he had hired an engineer at that point in time, the presence of a supporting expert on plaintiff's side of the case would necessarily play into defendant's own calculation about whether or not to retain its own engineer to rebut specific expert claims.

It is thus particularly galling to learn that Bryant quietly (albeit permissibly) hired his own engineer, afforded this engineer an opportunity to examine the structure and prepare a

---

[5]  The Court declines to put the onus of seeking intervention on GCCW, who after timely objecting to the planned demolition did not hear back from plaintiff or his counsel until after the deed was done.

report, sued defendant alleging a covered loss to the structure based at least in part on information from this engineer, learned that defendant wanted to examine the structure in connection with the newly filed litigation, and then took affirmative action to demolish the building before defendant's inspection could happen.

In short, Bryant's unilateral, purposeful decision to destroy the building deprived his opponent of access to critical physical evidence necessary to defend against the claimed loss.  *Cf. Spoiled Trucks & Cars Corp. v. C&N Realty Dev. LLC*, 2011 WL 6738859 (N.Y. Sup. Ct. Sept. 28, 2011) (striking pleading as sanction where plaintiff demolished property at heart of litigation before defendant could conduct a scheduled site inspection).  Accordingly, dismissal of plaintiff's complaint as a sanction is appropriate.

## B.  **The Policy**[6]

Even assuming a lesser sanction would be appropriate, GCCW would still be entitled to summary judgment on Bryant's claim.  Defendant contends that the building did not "collapse" within the meaning of the Policy, and that even if it did, two related exclusions apply to bar coverage for the loss.  Def.'s Mem. at 17.  Plaintiff responds that courts consider floors that "have slanted down, sank, dropped, or are displaced downward" to have "collapsed" within the meaning of this kind of coverage.  Pl.'s Opp'n at 8.

---

[6]  The parties have consistently applied New York law to this dispute, *Bryant*, 2019 WL 367292, at *2, and have offered no reason to deviate from this approach on summary judgment.

A reader has to peel back several layers to make sense of the coverage provided under the Policy.  The standard version of the Policy actually contains an exclusion of coverage for collapse:

> B.   Exclusions
>
>> 1.   We will not pay for loss or damage cause directly or indirectly by any of the following.  Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.
>
> . . . .
>
>> k.   Collapse, including any of the following conditions of property or any part of the property:
>>
>>> (1)   An abrupt falling down or caving in;
>>>
>>> (2)   Loss of structural integrity, including separation of parts of the property or property in danger of falling down or caving in; or
>>>
>>> (3)   Any cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion as such conditions relates to (1) or (2) above.

Policy at 75.

However, this "k" exclusion for collapse does not apply where, as here, the insured has purchased additional coverage for collapse.  Policy at 75, 78.  This "additional coverage" provision reads as follows:

> D.   Additional Coverage – Collapse
>
> The coverage provided under this Additional Coverage – Collapse applies only to an abrupt collapse as described and limited in D.1. through D.7.
>
>> 1.   For the purpose of this Additional Coverage – Collapse, abrupt collapse means an abrupt falling

down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose.

2. We will pay for direct physical loss or damage to Covered Property, caused by abrupt collapse of a building or any part of a building that is insured under this Coverage Form or that contains Covered Property insured under this Coverage Form, if such collapse is caused by one or more of the following:

a. Building decay that is hidden from view, unless the presence of such decay is known to an insured prior to collapse;

b. Insect or vermin damage that is hidden from view, unless the presence of such damage is known to an insured prior to collapse;

c. Use of defective material or methods in constructed, remodeling or renovation if the abrupt collapse occurs during the course of the construction, remodeling or renovation.

d. Use of defective material or methods in construction, remodeling or renovation if the abrupt collapse occurs after the construction, remodeling or renovation is complete, but only if the collapse is caused in part by:

(1) A cause of loss listed in 2.a. or 2.b.;
(2) One or more of the "specified causes of loss";
(3) Breakage of building glass;
(4) Weight of people or personal property; or
(5) Weight of rain that collects on a roof.

Policy at 78.

Of course, this additional coverage comes with its own set of limitations:

3. This Additional Coverage – Collapse does not apply to:

a. A building or any part of a building that is in danger of falling down or caving in;

b. A part of a building that is standing, even if it has

separated from another part of the building; or

c.   A building that is standing, even if it shows evidence
of cracking, bulging, sagging, bending, leaning,
settling, shrinkage or expansion.

Policy at 78.

GCCW contends that the damage to the building is not covered under this "collapse"

provision because the undisputed evidence shows that it was not an "abrupt" event but rather

the result of "long term deterioration."  Def.'s Mem. at 19.  Bryant, for his part, cites to a host

of cases in which courts have concluded that "a part of a building (roof, trusses, support

columns, ceiling, or flooring) that abruptly or suddenly deflected, buckled, dropped, or was

displaced downward" qualify as an "abrupt falling down or caving in" within the meaning of

the Policy definition.  Pl.'s Mem. at 4.

"Insurance policies are, in essence, creatures of contract, and, accordingly, subject to

principles of contract interpretation."  *Axis Ins. Co. v. Stewart*, 198 F. Supp. 3d 4, 11

(N.D.N.Y. 2016) (quoting *In re Estates of Covert*, 97 N.Y.2d 68, 75 (N.Y. 2001)).  "Under New

York law, a written contract is to be interpreted so as to give effect to the intention of the

parties as expressed in the unequivocal language they have employed."  *Id*. (quoting *Porco*

*v. Lexington Ins. Co.*, 679 F. Supp. 2d 432, 435 (S.D.N.Y. 2009).

"When the provisions are unambiguous and understandable, courts are to enforce

them as written."  *Axis Ins. Co.*, 198 F. Supp. 3d at 11 (citation omitted).  "Where, on the

other hand, contract terms are capable of more than one meaning when viewed objectively

by a reasonably intelligent person who has examined the context of the entire integrated

agreement and who is cognizant of the customs, practices, usages and terminology as

generally understood in the particular trade or business, the contract terms are ambiguous

and summary judgment is [generally] inappropriate." *Id*.

Upon review of the Policy's terms, the damage to the building does not qualify as a "collapse" under the additional extension of coverage.  Putting aside Bryant's post-hoc characterization of the damage as a "collapse," there is clearly nothing "abrupt" about what happened to the building's floor such that "the building or part of the building cannot be occupied for its intended purpose."

In January of 2017, the tenant advised Bryant that the ceramic tile of the kitchen floor "seemed to be lowering."  After this initial report, plaintiff failed to take any action because he "forgot" about the tenant's complaint.  Bryant Dep. at 17:4-8.  About ten days later, plaintiff informed the tenant that he planned to have someone come take a look at the building.  *Id*. at 18:18-19:1.  Both before and after plaintiff finally got around to looking into the problem, the tenant continued operating the restaurant in the building.  *See generally id*.

Of course, collapse coverage that provides insurance for "any part" of a building makes it "clear that the whole building need not collapse."  *Parauda v. Encompass Ins. Co. of Am.*, 2018 WL 616176, at *4 (N.Y. Sup. Ct. Jan. 25, 2018).  However, courts have also recognized that this kind of policy provision still requires that "the collapse must significantly effect the structure of the building."  *Id*.

As the Third Department has explained, "the clear modern trend is to hold that collapse coverage provisions [-] which define collapse as not including cracking and settling- provide coverage if there is substantial impairment of the structural integrity of the building or any part of a building."  *Wangerin v. N.Y. Cent. Mut. Fire Ins. Co.*, 974 N.Y.S.2d 631, 632 (N.Y. App. Div. 3d Dep't 2013).

In fairness to Bryant, there is a line of New York cases that suggest a "lowering of the

floor" caused by hidden decay might constitute a covered "collapse."  For instance, in

*Parauda*, the court found that homeowners had established that vertical studs supporting the

second floor of their home had "collapsed" from serious, hidden decay.  2018 WL 616176.

In *Nemier*, the Fourth Department held that homeowners established a "collapse" within the

meaning of their policy "when a corner of the room sank several inches."  *Nemier v. Liberty

Mut. Ins. Co.*, 735 N.Y.S.2d 295 (N.Y. App. Div. 4th Dep't 2001).  And in *Wangerin*, the Third

Department found that a roughly four-inch drop in the height of the floor in the

plaintiff–homeowners' house constituted a "collapse" even though "no part of the floor/ceiling

actually fell completely."  974 N.Y.S.2d at 633-34.

 These are all homeowner insurance policies rather than the commercial building

coverage at issue in this litigation.  With or without relying on that distinction, though, other

New York courts have demanded a greater showing of damage.  For instance, in *Rector St.

Food Enters., Ltd. v. Fire & Cas. Ins. Co.*, the First Department concluded that similar

"collapse" language did not cover a building that was sinking and leaning because it was still

standing.  827 N.Y.S.2d 18 (N.Y. App. Div. 1st Dep't 2006); *see also Dalton v. Harleysville

Worcester Mut. Ins. Co.*, 557 F.3d 88, 92 n.1 (2d Cir. 2009) (explaining that "collapse" was

explicitly defined in the *Rector St.* policy as requiring "an abrupt falling down or caving in").

 Upon review, the language of the actual Policy at issue in this particular dispute

provides many of the same explicit, clear definitions.  It explains that a "collapse" is a sudden

event:  it is "an abrupt falling down or caving in of a building or any part of a building with the

result that the building or part of the building cannot be occupied for its intended

purpose."  And the Policy further states that this "collapse" coverage is inapplicable to "[a]

building that is standing, even if it shows evidence of cracking, bulging, sagging, bending,

leaning, settling, shrinkage or expansion."

Measured against this more specific language, it is hard to conclude that evidence of "settling" or "sagging" that is not "abrupt" in nature can still qualify as a "collapse." However, even assuming that Bryant's cited case law lends sufficient support to conclude that the damage to the building amounted to a "collapse," GCCW points to a pair of exclusions for loss caused by long-term water damage or rot that would also bar plaintiff's claim.

First, the Policy contains a "Causes of Loss – Special Form" that specifically excludes coverage for:

> B.    Exclusions
>
> . . . .
>
> > 2.    We will not pay for loss or damage caused by or resulting from any of the following:
> >
> > . . . .
> >
> > > f.    Continuous or repeated seepage or leakage of water, or the presence or condensation of humidity, moisture or vapor, that occurs over a period of 14 days or more.

Policy at 72-74.

Second, the Policy includes an Endorsement entitled "New York Changes – Fungus, Wet Rot and Dry Rot." This endorsement reads as follows:

> A.    In the Causes Of Loss – Basic Form, Causes Of Loss – Broad Form, Causes Of Loss – Special Form, and Mortgageholders Errors And Omissions Coverage Form, the exclusion titled "Fungus", Wet Rot, Dry Rot And Bacteria and the Additional Coverage – Limited Coverage For "Fungus", Wet Rot, Dry Rot And Bacteria are deleted. Under these forms, the following exclusion is added:
>
> We will not pay for loss or damage caused by or resulting from "fungus", wet rot or dry rot. However, this exclusion does not apply when "fungus", wet rot or dry rot results from a Covered Cause of

Loss.

Policy at 163-64.

Upon review, Bryant has not established a triable issue of fact on the question of long-term water damage.  Plaintiff's own engineer, Mr. Morse, testified that:

> Q.    So the collapse event was caused by decay due to rot; is that accurate?
>
> A.    That's my professional opinion, yes.
>
> . . . .
>
> Q.    Over what period of time was this decay going on for?
>
> A.    I do not know.
>
> Q.    Do you have an estimate?
>
> . . . .
>
> Q.    Could it have been a month?
>
>        Ms. Phillips: Objection.  Calls for speculation.
>
> A.    It likely was not.  It was likely longer than a month.

Ex. F to Schapp Decl., Dkt. No. 47-9.[7]  Likewise, Mr. Golebiewski's April 2017 report concluded that:

> A leak in the kitchen sink for a long period of time has caused extensive rot damage to the sub-floor and floor joists in this risk. The rotting of the floor boards has also caused some structural issues as support beams are now sitting on nothing as the floor support has completely rotten through.  this has caused some large drywall cracks along several walls in this area.

Ex. I to Schapp Decl., Dkt. No. 47-12.

---

[7]  As GCCW also points out, Bryant seems unable to offer evidence from which to conclude that the "abrupt collapse" occurred within the policy period, which ran through August of 2017.  For instance, Mr. Morse testified that this "abrupt collapse" occurred just prior to his January 16, 2018 inspection.

So Bryant's engineer characterized the damage occurring over at least a months' time.  And so did GCCW's adjuster.  In fact, when plaintiff tendered the claim to defendant in March of 2017, the claim file recorded the loss as "wet rot damage" caused by a "water leak."  Plaintiff denies that he reported the claim this way, but that alone is not sufficient to raise a triable issue of fact.

That is especially so in this case, since even the construction firm hired by plaintiff to investigate the source of the damage advised him by e-mail that the building had been previously remodeled right over the top of "a decaying existing floor system" with "four to six inches of standing water below the old floor."  Bryant Dep. at 41:2-42:9.  In other words, virtually all the evidence in this case lines up one way—the damage to the structure stemmed from the continuous or repeated seepage or leakage of water that occurred over a period of 14 days or more.

As a final matter, Bryant offers up *Maki v. Allstate Ins. Co.*, 320 F. Supp. 3d 380 (D. Conn. 2018), a district court case holding that general exclusions in a policy (such as for water damage) can be trumped by the purchase of a coverage extension (such as for damage sustained by a collapse).

The *Maki* decision is just one of hundreds of cases brought by Connecticut homeowners whose home foundations have collapsed or will collapse from defective concrete manufactured between 1983 and 2010 by J.J. Mottes Concrete Company.  *See, e.g.*, *Karas v. Liberty Ins. Co.*, 228 A.3d 1012, 1016 (Conn. 2019) (describing the ongoing litigation).  In any event, *Maki* involves the application of Connecticut state insurance law to the policy language of a "collapse."  The Court declines to adopt *Maki*'s approach for the New York policy at issue in this litigation.

## V. **CONCLUSION**

Therefore, it is

ORDERED that

1. GCCW's motion for summary judgment is GRANTED;

2. Bryant's motion for partial summary judgment is DENIED; and

3. Bryant's complaint is DISMISSED.

The Clerk of the Court is directed to enter judgment accordingly and close the file.

IT IS SO ORDERED.


Dated: August 31, 2020

      Utica, New York.

                                 United States District Judge